IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| JENNIFER ECKLUND, | : | |
| | : | C.A. NO. _____ |
| Receiver, | : | |
| | : | **JURY DEMAND** |
| V. | : | |
| | : | |
| WELLS FARGO BANK, N.A. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## RECEIVER'S COMPLAINT AGAINST WELLS FARGO BANK, N.A.

Plaintiff, Jennifer Ecklund, in her capacity as the Court-appointed Receiver (the "**Receiver**") for Thurman P. Bryant, III ("**Bryant**") and Bryant United Capital Funding, Inc. ("**BUCF**") (Bryant and BUCF, collectively, the "**Bryant Defendants**") and Defendant Arthur F. Wammel ("**Wammel**"), Defendant Wammel Group, LLC (the "**Wammel Group**"), and Wammel Group Holdings Partnership ("**WGHP**") (together Wammel, Wammel Group, and WGHP, the "**Wammel Defendants**") receivership estates (together, the "**Receivership Estate**" or the "**Receivership**"), by and through undersigned counsel, hereby files this *Complaint* individually, on behalf of the now-defunct entities BUCF and the Wammel Group,[1] and on behalf of others similarly situated (the "Class Representatives") (the Receiver and Class Representatives are collectively referred to herein as "Plaintiffs"). Plaintiffs hereby file this Complaint Against Wells Fargo Bank, N.A. ("Wells Fargo"), and would respectfully show this Court the following:

---

[1] The Receiver has agency for the now-defunct entities, Bryant United Capital Funding, Inc. and Wammel Group LLC. As such, the Receiver asserts standing on behalf of the now-defunct entities to recover monies which said entities may legally be entitled to. Monies restored to the companies would inure to the benefit of the defrauded investors, and thus, these entities' claims are part of the receivership.

# I.    <u>INTRODUCTION</u>

1.     This case arises out of, and is ancillary to, a lawsuit brought by the Securities and Exchange Commission ("**SEC**") against Bryant Defendants, Wammel Defendants, Carlos Goodspeed a/k/a Sean Phillips a/k/a GC d/b/a Top Agent Entertainment d/b/a Mr. Top Agent Entertainment ("**Goodspeed**"), and Relief Defendant Thurman P. Bryant, Jr. ("**Bryant, Jr.**") for claims related to a fraudulent investment scheme created, organized, and operated by the Bryant Defendants. That lawsuit is styled *SEC v. Thurman P. Bryant, III, et al.*, No. 4:17-cv-00336-ALM, and is pending in the United States District Court for the Eastern District of Texas, Sherman Division ("***SEC v. Thurman P. Bryant, III, et al.***" or the "**Main Case**").

2.     On May 5, 2017, the Securities and Exchange Commission initiated an emergency action to halt an ongoing investment scheme and securities fraud perpetrated on approximately 100 unsuspecting investors by the Receivership Defendants Thurman P. Bryant, III and his company Bryant United Capital Funding, Inc. (collectively, "Bryant Defendants"). In addition to the claims against the Bryant Defendants, the Commission named Arthur F. Wammel and his company Wammel Group, LLC, (collectively, "Wammel Defendants") as defendants based on their receipt of ill-gotten proceeds from the Bryant Defendants. The SEC's complaint in *SEC v. Thurman P. Bryant, III, et al.* describing the Ponzi scheme is incorporated herein by reference.

3.     The Receiver's investigation to date reveals that substantial cash withdrawals were made by the Bryant Defendants and the Wammel Defendants from accounts with Wells Fargo. (When referring specifically to withdrawals made by the Bryant and Wammel Defendants, said withdrawals will be referred to as "Cash Withdrawals.")  The Cash Withdrawals, which originated from investor funds, ultimately aided in funding the BUCF network and Ponzi scheme.  The Bryant

Defendants and the Wammel Defendants benefitted from over 5 million dollars in these Cash Withdrawals.

4.      The Cash Withdrawals received directly by the Bryant Defendants and/or the Wammel Defendants were fraudulent transfers, or, in the alternative, unjustly enriched the Bryant and/or Wammel Defendants. The Cash Withdrawals received should be part of the Receivership Estate. Due to the acts and omissions of Wells Fargo, the Bryant and Wammel Defendants perpetuated their Ponzi scheme and accomplished nearly-untraceable Cash Withdrawals to the tune of millions of dollars. Wells Fargo is liable to the Receivership Estate for an amount equaling the Cash Withdrawals in addition to the fees each received; as well as attorney's fees, costs, and interest to the Receiver.

## II.      PARTIES

5.      Plaintiff Jennifer Ecklund was appointed as Receiver for the Bryant Defendants by order of this Court signed May 15, 2017, and superseded by the Amended Order Appointing Receiver (and including the Wammel Defendants in the Receivership) entered on July 19, 2017 (the "**Receivership Order**"), which are in the Court's record and incorporated herein by reference. The Receivership Order authorizes the Receiver to, *inter alia*:

> institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers rescission . . .

¶ 41, p. 13.[2]

6.      Defendant Wells Fargo Bank, N.A., is a foreign financial institution incorporated under the federal law. It has its principal place of business in the State of California. Wells Fargo's

---

[2] *See* fn. 1.

**COMPLAINT** - Page 3 of 26

registered agent for service of process in Texas is Corporation Service Company dba CSC-Lawyers Incorporating Service Company located at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III.     JURISDICTION & VENUE

7.      Pursuant to 28 U.S.C. §1332, this Court has original jurisdiction in this matter as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the matter is between citizens of different states, and under the doctrine of supplemental jurisdiction. This Court has subject-matter jurisdiction over the matters raised by this lawsuit pursuant to 28 U.S.C. § 1367 because this action is ancillary to *SEC v. Thurman P. Bryant, III, et al. See Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010); *see also Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981). Moreover, the money used for the Cash Withdrawals, as described herein, constitutes a Receivership Asset, defined in the Receivership Order as "all property interests of the Receivership Defendants, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendant owns, possesses, has a beneficial interest in, or controls directly or indirectly." Receivership Order, ¶ 7(A), p. 3.

8.      Venue is proper in this Court because this action is ancillary to *SEC v. Thurman P. Bryant, III, et al.*, and pursuant to 28 U.S.C. §§ 754 and 1692, the Receiver may sue in the district in which she was appointed to enforce claims anywhere in the country.

## IV.    FACTS AND PROCEDURAL BACKGROUND

9.      The Receiver relies on, and hereby incorporates by reference, the specific factual allegations made by the SEC in its complaint against the Bryant Defendants, Wammel Defendants, Goodspeed, and Relief Defendant Bryant, Jr.

### A.    BRYANT CREATES THE BUCF SCHEME

10.     In early 2011, Bryant formed BUCF and is, and always has been, BUCF's sole officer, manager, and decision-maker. Bryant opened, maintained, and had sole signatory authority over BUCF's single bank account, Wells Fargo Account No. XXXX9659. Hence, Bryant and BUCF's interests and activities were one and the same and their interest are, and always have been, aligned. *See* Main Case, First Amended Complaint, Dkt. No. 154.

11.     Generally, Bryant pitched to investors orally representing, among other things, that investor funds would be protected in segregated, secure escrow accounts and used solely to serve as "proof of funds" for BUCF to secure a line of credit from a hedge fund. Main Case, First Amended Complaint, Dkt. No. 154. Bryant further represented that BUCF would use the line of credit to fund short-term mortgage loans, which long-term lenders would purportedly quickly purchase in exchange for a set fee paid to BUCF. Furthermore, Bryant promised investors, orally and in partnership agreements, that their investment bore no risk and was guaranteed to generate 2.5% monthly returns for a total of 30% annually. The Bryant Defendants raised more than $22 million from approximately 100 investors located in Texas and other states, and at least two international investors (the "**Defrauded Investors**").

12.     However, Bryant's promises were false. No secure escrow accounts existed, and there was no mortgage-related investment program. In reality, and directly contrary to representations made to investors, Bryant commingled investor funds in a single BUCF deposit

account controlled by Bryant, from which more than $16 million was transferred to the Wammel Group and more than $4 million was transferred to the Transferees. Returns were paid to investors from monies raised from other investors.

**B.    WAMMEL DEFENDANTS' PONZI SCHEME.**

13.    Similar to Bryant, the Wammel Defendants began selling limited partnership interests as documented by the *Limited Partnership Agreement of Wammel Group* ("**Wammel Partnership Agreement**."). The Wammel Defendants ultimately raised approximately $44.7 million from early June 2007 through December 2016. These funds came from three primary investor groups: (1) BUCF *i.e.* Bryant without informing or obtaining permission from BUCF's unwitting investors ($16.1 million); (2) one large investor ($25 million); and (3) approximately 15 other investors the Wammel Group solicited ($3.6 million) (the "**Wammel Defrauded Investors**")(together Wammel Defrauded Investors and BUCF Defrauded Investors, the "**Defrauded Investors**").

14.    According to the SEC's Amended Complaint, The Wammel Defendants told investors that they would engage in options trading with their invested funds, and promised BUCF annual returns of 42% or more that would be derived from the monthly earnings of the Wammel Defendants' trading activity. The Wammel Defendants promised other investors a *pro rata* share of the monthly earnings from the trading. However, the Wammel Defendants' promises to BUCF and other investors were false. The bank and brokerage account records show that the Wammel Defendants failed to earn sufficient returns to support the investors' distributions. For example, in February and March 2014, the Wammel Defendants' options trading earnings totaled approximately $12,600 and the balance of the Wammel Group's bank account was less than $7,000. But during these same months, Wammel emailed Bryant statements reflecting $405,260

**COMPLAINT** - Page 6 of 26

of earnings and distributed more than $387,00 to BUCF. The bank records show that the only material source of cash during this period were the new investments from the Defrauded Investors. Returns were paid to the Winning Investors from monies raised from other investors.

C.    **BRYANT PARTNERS WITH WAMMEL**

15.    As part of Bryant's investment scheme, BUCF partnered with the Wammel Group, which in turn invested BUCF investor funds in high-risk options trading. *See* Main Case, Memorandum Opinion and Order, Dkt. No. 89 at 8 ("[Bryant] Defendants transferred funds to the Wammel Parties, who then commingled [Bryant] Defendants' funds with Wammel Group investors' funds and invested in high-risk options trading.").

16.    As Bryant offered and sold BUCF's securities to investors, other entities—Bryant United Holdings, Inc. d/b/a Bryant United d/b/a Bryant Financial d/b/a Bryant United Realtors, WGHP, and the Wammel Group—acted as conduits through which Defrauded Investor money flowed. Each of these entities was owned or controlled by Bryant and/or Wammel who worked in concert to defraud investors.

17.    Based on the Receiver's investigation, the relationship between the Bryant Defendants and the Wammel Defendants functioned as follows: (1) investors would transfer money to BUCF, (2) BUCF would transfer money from the Wells Fargo Account to the Wammel Group, (3) the Wammel Group would commingle such monies with the Wammel Group investor funds, (4) the Wammel Group would invest such funds in high-risk trading, and (5) the Wammel Group would eventually transfer funds back to the BUCF Wells Fargo Account.

18.    From July 2011 through April 2017, Bryant transferred more than $16 million from BUCF to the Wammel Group. Wammel commingled Wammel Group investors' funds with BUCF investors' funds. The Wammel Defendants used the majority of the $16.2 million of BUCF

investor capital received, commingled with $28.6 million in funds raised from the Wammel Defendants' own investors, to fund speculative options and securities trading. By commingling the BUCF investor funds with money raised from the Wammel Group's own non-BUCF investors, the Wammel Defendants facilitated the interrelated Ponzi schemes to: (1) make distributions to BUCF; (2) make distributions to the Wammel Group's investors; (3) fund high-risk investments; and (4) fund their extravagant lifestyles.

19.     The Wammel Group does not have, and never has had, any legitimate claim to the funds it received from BUCF.

20.     In addition to the $16.2 million transferred from BUCF to the Wammel Group, Bryant, individually, misappropriated at least $4.8 million of BUCF investor funds to fund his personal living expenses. *See id.* at 2-4. Similarly, Wammel withdrew or transferred to himself over $5.5 million of commingled BUCF investor funds and Wammel Group investor funds from 2011 to 2017. *See id.*

21.     The Bryant Defendants and Wammel Defendants absconded with the principal of investors and used the funds for personal gain. BUCF and Wammel Group paid purported earnings to certain investors above and beyond the original investments made by the particular investors themselves. The profit received by these investors was fictitious. Rather, Bryant and Wammel used the funds invested by later investors to pay "earnings" or "interest" to earlier investors, and the Ponzi scheme was perpetuated in this way for years.

**D.    WELLS FARGO'S ROLE IN PERPETUATING THE PONZI SCHEME**

22.     Bryant formed BUCF in or around June 2011 and at all relevant times was BUCF's sole officer, manager, decision-maker, and employee. Bryant opened, maintained, and has sole

signatory authority over BUCF's single bank account. Hence, Bryant and BUCF's interests and activities were one and the same and their interests are, and always have been, aligned.

23.     Bryant United Capital Funding, Inc. and its affiliates held an account with Wells Fargo ending in 9692. Cash Withdrawals were effectuated from this account via ATM withdrawals, E-Cash withdrawals, cashier's checks, and branch store withdrawals.

24.     Arthur Wammel, Wammel Group LLC, and its affiliates also held accounts at Wells Fargo. Specifically, Arthur Wammel held an account with Wells Fargo ending in 7284, Summus Investment Holdings, LLC held an account with Wells Fargo ending in 5108, and Wammel Group LLC held an account with Wells Fargo ending in 9950. Cash withdrawal amounts were effectuated via ATM withdrawals, E-Cash withdrawals, cashier's checks, and branch store withdrawals. Withdrawal slips were signed by either WSG Equity Partners, Brian Swift, or Jein Gadson.

25.     Both the Bryant Defendants and Wammel Defendants chose Wells Fargo to be the bank that would accommodate their fraudulent schemes.

26.     The Cash Withdrawals collectively make up more than $4 million from the Bryant Defendants and Wammel Defendants. Accomplishing these Cash Withdrawals benefitted the Ponzi scheme. The Cash Withdrawals were made by, or at the direction of, Bryant or Wammel. The Cash Withdrawals were monies which were misappropriated from the Defrauded Investors.

27.     The Bryant Defendants transferred approximately $1,731,701 in Cash Withdrawals from Wells Fargo accounts.

28.     The Wammel Defendants transferred approximately $4,572,919 in Cash Withdrawals from Wells Fargo accounts.

29.     The money used to make these Transfers came directly from innocent, unwitting investors in the Ponzi scheme. Both the Bryant Defendants and the Wammel Defendants deposited investor funds into their various accounts.

30.     Cash Withdrawals were made by or at the direction of Bryant or Wammel from Wells Fargo accounts. While the Receiver has no information currently to suggest that Wells Fargo had any involvement with the fraud alleged herein, Wells Fargo was a fiduciary for the investor funds.

31.     Wells Fargo completely and utterly failed to follow industry standards and its own internal rules. These rules require some level of reasonable inquiry to determine the intended purpose of a customer's transactions, to prevent potential fraud, and to investigate whether said transactions may constitute an illegitimate or illegal scheme. Wells Fargo either knew about the illegal scheme and fraudulent transfers made by the Bryant and Wammel Defendants, or willfully ignored the abundant evidence that was present.

32.     The Bryant Defendants' bank statements reflect significant cash withdrawals from the Bryant Defendants' accounts. In October of 2015 alone, cash withdrawals from the Bryant United Capital Funding Inc. account alone totaled $1.2 million.

33.     On the part of the Wammel Defendants, Wells Fargo regularly allowed cash withdrawals via branch store withdrawal slips of over $200,000. In May of 2016 alone, cash withdrawals from the Wammel Group LLC account totaled $602,403.

34.     By example and without limitation, for the Bryant account with Wells Fargo ending in 9692, there are eleven individual instances of cash withdrawals of $10,000 or more. Two of the individual withdrawals were each more than six figures. One was a seven-figure branch store

withdrawal for cash in the amount of $1,250,000. These withdrawals were accomplished by branch store withdrawals and cashier's checks.

35.     Further, by example and without limitation, on the Wammel Group LLC account with Wells Fargo ending in 9950, there were 39 individual instances of cash withdrawals of more than $10,000. Twelve of these individual withdrawals were six-figure withdrawals. Ten of the six-figure withdrawals occurred in 2016 alone. These withdrawals were accomplished by branch store withdrawals and cashier's checks.

36.     Specifically, the Cash Withdrawals consisted of at least the following:[3]

| Date | Account | Amount | Type |
|---|---|---|---|
| 11/16/11 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $15,000 | Cashier's Check |
| 1/17/14 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $10,000 | Branch Store Withdrawal |
| 2/19/14 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $10,000 | Branch Store Withdrawal |
| 6/11/14 | WF - BUCF - 9692 Cash Withdrawal to Wammel Group | $100,000 | Branch Store Withdrawal |
| 7/22/15 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $10,406 | Branch Store Withdrawal |
| 10/7/15 | WF - BUCF - 9692 Cash Withdrawal to Wammel Group | $1,250,000 | Branch Store Withdrawal |
| 12/15/16 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $13,750 | Branch Store Withdrawal |
| 1/12/17 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $10,000 | Cashier's Check |
| 4/4/17 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $20,000 | Cashier's Check |

------------------------

[3] The Receiver's investigation is ongoing and additional cash withdrawals may be later identified in the course and scope of the Receivership.

| Date | Account | Amount | Type |
|---|---|---|---|
| 4/4/17 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $100,000 | Cashier's Check |
| 4/4/17 | Wells Fargo-Bryant United Capital Funding Inc. -9692 | $20,000 | Branch Store Withdrawal |
| 9/22/10 | Wells Fargo - Wammel Group LLC - 9950 | $12,500 | Branch Store Withdrawal |
| 3/28/11 | Wells Fargo - Wammel Group LLC - 9950 | $23,500 | Branch Store Withdrawal |
| 8/29/11 | Wells Fargo - Arthur Wammel - 7284 | $147,300 | Branch Store Withdrawal |
| 12/21/11 | Wells Fargo - Wammel Group LLC - 9950 | $10,000 | Cashier's Check |
| 4/5/13 | Wells Fargo - Wammel Group LLC - 9950 | $25,000 | Branch Store Withdrawal |
| 11/20/13 | Wells Fargo - Wammel Group LLC - 9950 | $10,000 | Branch Store Withdrawal |
| 1/2/14 | Wells Fargo - Wammel Group LLC - 9950 | $45,000 | Branch Store Withdrawal |
| 1/3/14 | Wells Fargo - Wammel Group LLC - 9950 | $88,000 | Branch Store Withdrawal |
| 5/1/14 | WF - Wammel Group - 9950 Cash Withdrawals to BUCF | $92,000 | Branch Store Withdrawal |
| 7/17/14 | Wells Fargo - Wammel Group LLC - 9950 | $10,000 | Branch Store Withdrawal |
| 8/28/14 | Wells Fargo - Wammel Group LLC - 9950 | $58,879 | Cashier's Check |
| 2/5/15 | Wells Fargo - Wammel Group LLC - 9950 | $10,000 | Cashier's Check |
| 6/1/15 | Wells Fargo - Wammel Group LLC - 9950 | $20,000 | Branch Store Withdrawal |
| 7/6/15 | Wells Fargo - Wammel Group LLC - 9950 | $200,000 | Branch Store Withdrawal |

| Date | Account | Amount | Type |
|------|---------|--------|------|
| 8/3/15 | Wells Fargo - Wammel Group LLC - 9950 | $15,000 | Cashier's Check |
| 8/24/15 | Wells Fargo - Wammel Group LLC - 9950 | $51,750 | Cashier's Check |
| 8/27/15 | Wells Fargo - Summus Investment Holdings, LLC - 5108 | $10,000 | Branch Store Withdrawal |
| 9/16/15 | Wells Fargo - Wammel Group LLC – 9950 | $61,000 | Cashier's Check |
| 12/16/15 | Wells Fargo - Wammel Group LLC - 9950 | $150,000 | Cashier's Check |
| 12/31/15 | WF - Wammel Group - 9950 Cash Withdrawals to BUCF | $306,025 | Branch Store Withdrawal |
| 1/29/16 | Wells Fargo - Wammel Group LLC - 9950 | $195,000 | Cashier's Check |
| 2/10/16 | Wells Fargo - Wammel Group LLC - 9950 | $225,000 | |
| 2/19/16 | Wells Fargo - Wammel Group LLC - 9950 | $82,765 | Cashier's Check |
| 3/11/16 | Wells Fargo - Wammel Group LLC - 9950 | $20,000 | Cashier's Check |
| 3/15/16 | Wells Fargo - Wammel Group LLC - 9950 | $40,000 | Cashier's Check |
| 3/21/16 | Wells Fargo - Wammel Group LLC - 9950 | $350,000 | Cashier's Check |
| 3/31/16 | Wells Fargo - Wammel Group LLC - 9950 | $300,000 | Cashier's Check |
| 4/8/16 | Wells Fargo - Wammel Group LLC - 9950 | $250,000 | Cashier's Check |
| 4/19/16 | Wells Fargo - Wammel Group LLC - 9950 | $50,000 | Cashier's Check |
| 5/2/16 | Wells Fargo - Wammel Group LLC - 9950 | $250,000 | Cashier's Check |
| 5/23/16 | Wells Fargo - Wammel Group LLC - 9950 | $150,000 | Cashier's Check |
| 5/26/16 | Wells Fargo - Wammel Group LLC - 9950 | $200,000 | Cashier's Check |
| 6/2/16 | Wells Fargo - Wammel Group LLC - 9950 | $50,000 | Cashier's Check |
| 6/17/16 | Wells Fargo - Wammel Group LLC - 9950 | $60,000 | Cashier's Check |
| 8/18/16 | Wells Fargo - Wammel Group LLC – 9950 | $18,000 | Cashier's Check |

| Date | Account | Amount | Type |
|------|---------|--------|------|
| 9/14/16 | Wells Fargo - Wammel Group LLC - 9950 | $10,000 | Cashier's Check |
| 9/21/16 | Wells Fargo - Wammel Group LLC - 9950 | $200,000 | Cashier's Check |
| 9/23/16 | Wells Fargo - Wammel Group LLC - 9950 | $96,000 | Cashier's Check |
| 10/19/16 | Wells Fargo - Wammel Group LLC - 9950 | $89,000 | Cashier's Check |
| 10/21/16 | Wells Fargo - Wammel Group LLC - 9950 | $200,000 | Cashier's Check |

37.     Industry standards, as well as Wells Fargo's own policies, require that suspicious activity be reported to the appropriate authorities. The fact that the Bryant Defendants and Wammel Defendants were making large cash withdrawals were clear examples of suspicious activity that Wells Fargo should have reported. As a result of Wells Fargo's failure to comply with their own standards and policies, the Bryant Defendants and the Wammel Defendants furthered the intent and purposes of their Ponzi scheme, and were able to abscond millions of dollars in almost untraceable cash funds. Notably, a large number of the cash withdrawals were made via cashier's checks. Despite the ample evidence of suspicious cash withdrawals, including numerous withdrawals of more than $10,000, and numerous six-figure withdrawals, Wells Fargo never verified or questioned any of the withdrawals, nor did Wells Fargo place appropriate restrictions preventing further large cash withdrawals.

38.     In sum, Wells Fargo and its agents either willingly or cooperatively (or with a willful blindness as to the suspicious activity perpetrated by the Bryant and Wammel Defendants in their Ponzi scheme) assisted the Bryant and Wammel Defendants in defrauding investors. By allowing massive cash withdrawals, Wells Fargo allowed the Bryan and Wammel Defendant to

conceal the misappropriated funds and divert invested monies into their personal accounts for large

cash disbursements, for purposes of further funding their own lavish lifestyles.

39.     The Receiver brings this action to rescind the Cash Withdrawals and/or recover

monies on behalf of the defrauded investors, because the funds used for the Cash Withdrawals

were those of other investors in the Ponzi scheme and were fraudulently withdrawn. Wells Fargo's

knowledge of the Bryant Defendants and Wammel Defendants fraud is immaterial to the claims

herein.

40.     Despite attempts by the SEC and the Receiver to marshal, collect, and liquidate

Receivership Assets, there are currently insufficient funds to fully reimburse the Defrauded

Investors.

## V.     CLASS REPRESENTATION ALLEGATIONS

41.     Pursuant to Rule 23 (a) and (b)(3), Fed. R. Civ. P., the Class Representatives bring

this action on their own behalf and on behalf of all others similarly situated.

### THE DEFINITION OF THE CLASS

42.     The Class is defined as follows:

All persons and entities who invested monies into BUCF mutual fund from 2011 to 2017,

and who have suffered damages as a result of such investments, and all person and entities who

invested monies into the Wammel Group from 2011 to 2017, and who have suffered damages as

a result of such investments, i.e., the Defrauded Investors.[4]

### NUMEROSITY

43.     Pursuant to Rule 23(a)(l}, the members of the Class are so numerous that separate

joinder of each Class member is impracticable. The members of the Class are believed to exceed

---

[4] The Receiver and Class Representatives reallege paragraphs 10 through 13 as if fully set forth herein.

100, with the exact number to be ultimately determined from the records of BUCF, whether maintained or reconstructed by the Receiver.

## COMMONALITY

44.     Pursuant to Rule 23(a)(2), common questions of fact and law affect the claims of each member of the designated Class; namely, whether Wells Fargo participated, either by intentional acts or willful blindness in the Ponzi scheme executed by the Bryant defendants and Wammel defendants, by conspiring to commit fraudulent transfers and by failing to comply with industry standards and their own standards and/or policies, making funds unavailable to reimburse victims of the scheme. A class action is the most efficient and effective device for resolving the claims alleged herein against Wells Fargo by the Defrauded Investors.

45.     The following are specific issues of fact common among the Class: (A) The manner in which the members of the Class invested in BUCF and/or Wammel Group; (B) BUCF's and Wammel Group's lack of legitimate business operations; (C) The theft of monies from BUCF and Wammel Group by the Bryant and Wammel defendants; (D) Wells Fargo's knowledge of and/or conscious indifference to the Ponzi scheme; (E) Wells Fargo's actions and/or inactions which resulted in in furthering the Ponzi scheme, including transferring millions of dollars in cash withdrawals from the Bryant and Wammel defendants' various accounts; and (F) The measure and amount of damages caused by the conduct of Wells Fargo.

46.     The following are specific issues of law common to each member of the Class: (A) The illegality of the Ponzi scheme orchestrated and executed by the Bryant and Wammel Defendants; (B) Wells Fargo's knowledge or willful blindness of its role and assistance to the Bryant and Wammel defendants; (C) Whether the transfers of funds by Wells Fargo were done without adequate consideration; (D) Whether Wells Fargo combined, confederated, agreed, and/or

conspired to further the Ponzi scheme; (E) Whether Wells Fargo failed to use reasonable care by not properly holding, safeguarding, or accounting for property committed to its care; (F) Whether Wells Fargo breached its fiduciary duty to the Class; and (G) Whether Wells Fargo assisted the Bryant and Wammel defendants in fraudulently diverting investor funds.

## TYPICALITY

47.     Pursuant to Rule 23(a)(3), the claims the Class Representatives bring are typical of the claims of each member of the Class. The legal claims asserted in this action, as well as the facts underlying those claims, are the same as would be advanced by all members of the Class were they to institute individual actions. Further, members of the Class have sustained damages as a result of the same course of misconduct by Wells Fargo.

## ADEQUACY OF REPRESENTATION

48.     Pursuant to Rule 23(a)(4), the representatives are adequate representatives of the Class and will fairly and adequately protect the interests and rights of the Class. As Class Representatives, they are aware of their duties on behalf of the Class and have agreed to undertake those responsibilities to the best of their ability. The claims of the Class Representatives are not antagonistic in any way to the interests of other Class members, nor are there any significant conflicts of interest between the Class Representatives and any members of the Class. The Class Representatives are committed to the vigorous prosecution of this action.

49.     The Class Representatives have retained undersigned counsel to represent them in this action. Said counsel are experienced in class action and complex commercial litigation matters, and are financially able and sufficiently staffed to see this case through conclusion.

50.     The adequacy of the Class is further demonstrated by support of the Receiver, who is financially able and prepared to proceed with the claims against Wells Fargo, and who is fully aligned with the interests of the Class in proving and recovering damages from Wells Fargo.

**FIRST REQUIREMENT OF RULE 23(B)(3) - PREDOMINANCE OF COMMON ISSUES**

51.     Questions of law and fact common to the claims of each member of the Class predominate over any question of law or fact affecting individual members of the Class. As is demonstrated under the commonality allegations above, the focus of this lawsuit is on the common issues of the Class' victimization by Wells Fargo's active involvement, participation, and/or assistance in the illegal scheme perpetrated by the Bryant Defendants and the Wammel Defendants, or by Wells Fargo's willful and reckless disregard for such actions.

**SECOND REQUIREMENT OF RULE 23(B)(3) - SUPERIORITY OF CLASS TREATMENT**

52.     Class treatment in this action is superior to the institution and maintenance of individual suits by individual members of the Class.

53.     There is no strong interest by individual Class members in separately filing and prosecuting their claims in individual suits against Wells Fargo. Many of the Class members lack sufficient finances to retain competent counsel willing to undertake a suit against Wells Fargo, which is a large institution with formidable financial and legal resources to oppose individualized suits. Also, some of the monies invested by BUCF's and Wammel Group's investors are modest in relation to the costs and risks associated with suing a litigant like Wells Fargo, and therefore render individualized suits cost-prohibitive. In contrast, class treatment is the most efficient and fair method of adjudicating the claims alleged herein against these defendants.

54.     The subject matter giving rise to the claims asserted here by the Class are the subject of ongoing litigation against the Bryant defendants and Wammel defendants in the action styled

*Securities and Exchange Commission v. Thurman P. Bryant, III et al,* Civil Action No. 4:17-cv-00336-ALM (the "SEC action"). The nature, extent, and manner of the scheme perpetrated by the Bryant defendants and Wammel defendants is essentially the same in the SEC action as in this case. While the SEC action focuses on one common issue of fact concerning the conduct of the scheme by the Bryant defendants and Wammel defendants, the SEC action and the relief sought therein is not concerned with the facts or legal claims against Wells Fargo. Based upon the continued pendency of the SEC action, it desirable to concentrate this class action in the Eastern District of Texas. In addition, Wells Fargo has offices, branches, and agents, and conducts substantial business in this District. Many of the acts and omissions giving rise to Wells Fargo's liability occurred here. There is no other forum more convenient or desirable than the Eastern District of Texas.

55.     There are no significant or unusual difficulties associated with the facts and legal theories giving rise to these claims which would preclude the maintenance of this case as a class action.

## VI.     CAUSES OF ACTION AGAINST WELLS FARGO

## COUNT I - CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFERS

56.     The Receiver and the Class Representatives reallege paragraphs l through 55 above as fully set forth herein.

57.     The Receiver and the Class Representatives assert this Count against Wells Fargo for civil conspiracy to commit fraudulent transfers.

58.     Wells Fargo and the Bryant and Wammel Defendants agreed, confederated, combined, and/or conspired to accomplish an unlawful purpose; to wit, the fraudulent transfer of property from BUCF's investors to the personal bank accounts and/or other companies of the

Bryant defendants and/or the Wammel defendants. Additionally, Wells Fargo facilitated the illegal transfer of monies in substantial cash withdrawals.

59.     These fraudulent transfers were made with the actual intent to hinder, delay, or defraud the investors of BUCF. Funds that were provided by investors with the purpose of investing were instead diverted to the Bryant and Wammel defendants' other personal bank accounts or to companies which the Bryant and Wammel defendants owned and controlled.

60.     Wells Fargo willingly agreed to participate in the scheme by the Bryant and Wammel defendants or, at the very least, combined and conspired with the Bryant and Wammel defendants by casting a blind eye to the illegality of the scheme -- the same scheme which allowed the Bryant and Wammel defendants to withdraw large sums of cash for purposes of bankrolling their own lavish lifestyles.

61.     Wells Fargo took action in pursuance of the illegal transfer of property out of BUCF funds, including performance of the following actions: (A) providing accounts for BUCF Funds which the Bryant and Wammel defendants used as a conduit for having investors deposit monies, and allowing the diversion of substantial amounts of funds for the personal use of the Bryant and Wammel defendants; (B) completing hundreds of cash withdrawals, wire transfers, and withdrawals, totaling millions of dollars in investor funds, to the Bryant and Wammel defendants' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims; (C) completing millions of dollars worth of wire transfers between the Bryant and Wammel defendants' business accounts; (D) failing to comply with industry standards and their own internal rules regarding large cash withdrawals; and (E) failing to report any suspicious activity to the appropriate personnel.

62.     As a direct and proximate result of Wells Fargo's conspiracy to commit fraudulent transfers, the Plaintiffs have suffered uncompensated damages.

63.     WHEREFORE, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendant Wells Fargo for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT II - AIDING AND ABETTING FRAUDULENT TRANSFERS

64.     The Receiver and Class Representatives reallege paragraphs 1 through 63 above as fully set forth herein.

65.     The Receiver and Class Representatives assert this Count against Wells Fargo for aiding and abetting fraudulent transfers.

66.     The Bryant and Wammel defendants, with the assistance of their banks, defrauded investors by fraudulently transferring investor monies out of the Bryant and Wammel defendants' accounts and into their personal bank accounts and other companies. Further, the Bryant and Wammel defendants, with the assistance of their banks, defrauded investors by fraudulently transferring investor monies out of their personal bank accounts and other companies in the form of cash withdrawals and wire transfers.

67.     These fraudulent transfers were made with the actual intent to hinder, delay, or defraud the investors of BUCF. Funds that were provided by investors with the purpose of investing were instead diverted to the Bryant and Wammel defendants' personal bank accounts or to companies which these insiders owned and controlled.

68.     The investors relied on the fact that their monies would be a safe investment in BUCF, which were deposited in the Bryant and Wammel defendants' accounts at Wells Fargo.

69.     Wells Fargo knew, or should have known, that the Bryant and Wammel defendants were committing fraudulent transfers and actively and knowingly rendered substantial assistance to the Bryant and Wammel defendants in the fraud by, among other things: (A) providing accounts for BUCF Funds which the Bryant and Wammel defendants used as a conduit for having investors deposit monies, and allowing the diversion of substantial amounts of funds for the personal use of the Bryant and Wammel defendants; (B) completing hundreds of cash withdrawals, wire transfers, and withdrawals, totaling millions of dollars in investor funds, to the Bryant and Wammel defendants' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims; (C) completing millions of dollars worth of wire transfers between the Bryant and Wammel defendants' business accounts; (D) failing to comply with industry standards and their own internal rules regarding large cash withdrawals; and (E) failing to report any suspicious activity to the appropriate personnel.

70.     Wells Fargo aided and abetted the fraudulent transfers committed by the Bryant and Wammel defendants, and are liable for the damages caused thereby to the same extent as the Bryant and Wammel defendants.

71.     As a direct and proximate result of Wells Fargo's aiding and abetting the Bryant and Wammel defendants in their fraudulent transfers, the Plaintiffs have suffered uncompensated damages.

72.     WHEREFORE, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendant Wells Fargo for compensatory damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT III - COMMON LAW FRAUD AND/OR AIDING AND ABETTING COMMON LAW FRAUD

73.     The Receiver realleges paragraphs l through 72 above as fully set forth herein.

74.     The Receiver asserts this Count against Wells Fargo for common law fraud and/or aiding and abetting common law fraud.

75.     Wells Fargo knowingly made material misrepresentations and omissions and knowingly participated in the scheme in order to induce individuals to invest monies into BUCF by: (A) providing accounts for BUCF Funds which the Bryant and Wammel defendants used as a conduit for having investors deposit monies, and allowing the diversion of substantial amounts of funds for the personal use of the Bryant and Wammel defendants; (B) completing hundreds of cash withdrawals, wire transfers, and withdrawals, totaling millions of dollars in investor funds, to the Bryant and Wammel defendants' personal bank accounts and other companies, where the funds would otherwise be available for creditor claims; (C) completing millions of dollars worth of wire transfers between the Bryant and Wammel defendants' business accounts; (D) failing to comply with industry standards and their own internal rules regarding large cash withdrawals; and (E) failing to report any suspicious activity to the appropriate personnel.

76.     Wells Fargo knew or should have known that the Bryant and/or the Wammel defendants were operating a fraud. Additionally, Wells Fargo knew or should have known that their acts, misrepresentations and material omissions would mislead BUCF investors by creating respectability and credibility for the activities of the Bryant and Wammel defendants. BUCF investors deposited monies into the Bryant and Wammel defendants' accounts - monies which were ultimately diverted to the personal use of the Bryant and Wammel defendants.

77.     Wells Fargo is liable for the fraud of its agents and employees based on actual agency, apparent agency and negligent supervision.

78.     As a direct and proximate result of Wells Fargo's actions, the Plaintiffs have suffered uncompensated damages.

79.     WHEREFORE, the Receiver, demands judgment against Defendant Wells Fargo for compensatory damages, punitive damages, prejudgment interest, costs, and such other relief as this Court deems just and proper.

## COUNT IV - COMMON LAW NEGLIGENCE/NEGLIGENT HIRING AND SUPERVISION

80.     The Receiver and Class Representatives reallege paragraphs 1 through 79 above as fully set forth herein.

81.     The Receiver and Class Representatives assert this Count against Wells Fargo for breach of common law negligence and negligent hiring and supervision of Wells Fargo's employees.

82.     Wells Fargo either authorized or knew of the Cash Withdrawals by the Bryant and Wammel defendants.

83.     As a result of the large sums of cash being withdrawn, banking industry standards and their own internal procedures require Wells Fargo to use reasonable care in exercising its duties while holding, safeguarding, or accounting for property committed to its care.

84.     Wells Fargo breached its duty of reasonable care by not properly holding, safeguarding, or accounting for property committed to its care. The Bank Secrecy Act (31 U.S.C. § 1511, et seq.) requires financial institutions to file a suspicious activity report on cash transactions exceeding $10,000 (daily aggregate amount) and suspicious activity that might signal criminal activity. 31 C.F.R. § 1020.320. Wells Fargo failed to abide by the Bank Secrecy Act and failed to file suspicious activity reports on the cash transactions effectuated by the Bryant and Wammel defendants.

85.     Wells Fargo further had a duty to exercise reasonable care in the hiring, training, supervision, and employment of its employees, including but not limited to its branch store

employees. Wells Fargo failed to exercise reasonable care in hiring, training, supervising, and retaining employees by failing to ensure that employees had the necessary training, understanding, and skill which a prudent bank employee would exercise. Wells Fargo's conduct was a breach of its duty and a proximate cause of the injuries sustained by Plaintiffs.

86.     As a direct and proximate result of Wells Fargo's negligence, Plaintiffs suffered uncompensated damages.

## VII.    <u>PRAYER</u>

WHEREFORE, the Class Representatives, individually and on behalf of all others similarly situated, request the following relief: (A) An Order certifying the Class and appropriate sub-classes, if any; (B) An Order appointing T. Micah Dortch and Maryssa J. Simpson as counsel for the Class; (C) Final Judgment awarding compensatory damages, punitive damages and prejudgment interest in favor of the Class and against Wells Fargo; (D) Final Judgment awarding reasonable attorneys' fees and reimbursement of costs and expenses to counsel for the Class; and (E) Such other and further relief as this Court deems appropriate.

WHEREFORE, further, the Receiver and the Class Representatives, individually and on behalf of the Class, demand judgment against Defendant Wells Fargo for compensatory damages, prejudgment interest, costs, and such other and further relief that Plaintiffs may be entitled to as this Court deems just and proper.

## VIII.    <u>DEMAND FOR JURY TRIAL</u>

The Receiver and the Class Representatives demand a jury trial on all claims and issues in this action triable as a matter of right.

Dated: <u>June 26, 2018</u>                    Respectfully submitted,

                                  By:    */s/ Timothy Micah Dortch*
                                  **TIMOTHY MICAH DORTCH**
                                  State Bar No. 24044981
                                  mdortch@potts-law.com
                                  **MARYSSA J. SIMPSON**
                                  State Bar No. 24088414
                                  msimpson@potts-law.com
                        **POTTS LAW FIRM, LLP**
                        2911 Turtle Creek Blvd, Suite 1000
                        Dallas, Texas 75219
                        Tel:  (214) 396-9427
                        Fax: (469) 217-8296

                        **ATTORNEYS FOR RECEIVER**